# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

TERESA A. LUCAS,

Plaintiff,

v.

STEEL KING INDUSTRIES, INC.,

Defendant.

OPINION & ORDER

13-cv-535-wmc

In this civil action, plaintiff Teresa Lucas alleges that defendant Steel King Industries, Inc. ("Steel King") violated the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by failing to disclose information about the group life insurance policy it maintained. Specifically, Lucas contends that Steel King violated its statutory obligations under ERISA and breached its common law fiduciary duties by failing to disclose to its employees the termination of a group life insurance policy issued by Anthem Life Insurance Company (the "Anthem Policy") and its replacement with a new group life insurance policy issued by Reliance Standard Life Insurance Company (the "Reliance Policy"). Among the consequences of this failure, Lucas alleges, was a missed opportunity to maintain a life insurance policy on the life of her now deceased husband after he fell gravely ill and was diagnosed with a likely-terminal form of cancer. Defendant has now moved for summary judgment. (Dkt. #16.) Because the court finds that Steel King did not violate ERISA's disclosure provisions, and because any arguable breach of fiduciary duty could not have caused the harm plaintiff claims, that motion will be granted.

UNDISPUTED FACTS[1]

Plaintiff Teresa Lucas's late husband, Robert Lucas, began employment with Steel King, a Wisconsin corporation, in 1974.  Throughout his employment, he was a member of the Local 811 of the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers ("Local 811").  The Local 811 and Steel King had a collective bargaining agreement ("CBA"), which was in force between April 14, 2011 and April 12, 2015.  In the CBA, Steel King agreed to provide and pay the full cost of group life insurance for its employees and qualifying spouses, in the amount of $25,000.[2]  The CBA also states that the provisions of each insurance plan "shall not be changed or modified during the term of this Agreement, except by mutual agreement between the Company and the Union."  (*See* Jenifer D. Binder Aff. Ex. 2 (dkt. #32-4) Steel King 00026.)  Finally, it states that the insurance contracts "are the controlling documents for all questions concerning benefits and plan operations."  (*Id*.)

In August of 2011, Robert Lucas was diagnosed with cancer.  Due to his illness, his last active day of work at Steel King was September 1, 2011.  However, he remained an employee per the union contract for purposes of continuous service and seniority through the date of his death in 2012.

From January 1, 2011, through December 31, 2011, Steel King was the sponsor and administrator of the Steel King Industries Health & Life Plan ("Health & Life Plan"), which

---

[1] Unless otherwise noted, the court finds the following facts to be material and undisputed.

[2] Defendant asks the court to disregard the CBA because it is accompanied only by the affidavit of plaintiff's attorney, who cannot properly authenticate it for trial purposes.  Binder has averred that the CBA is a true and correct copy of defendant's own Rule 26 disclosures.  (*See* Jenifer D. Binder Aff. (dkt. #32) ¶ 3.)  It is, therefore, properly before the court at summary judgment, since plaintiff would likely be able to authenticate it through Steel King employees at trial.  *See Hackel v. Nat'l Feeds, Inc.*, -- F. Supp. 2d --, 2013 WL 6441030, at *2 (W.D. Wis. Dec. 9, 2013) (citing *Kasten v. Saint-Govain Performance Plastics Corp.*, 556 F. Supp. 2d 941, 948 (W.D. Wis. 2008)).

was insured by Anthem Life Insurance Company ("Anthem") under the Anthem Policy. While the parties dispute when coverage under the Anthem Policy began, they agree that it was in force during the whole of 2011. There is also no dispute that at some point before January 1, 2012, Steel King provided Robert Lucas with the terms and conditions of the Anthem Policy, including those related to his right to convert.

The life insurance component of the Anthem Policy included the "Anthem Group Insurance Policy and the Basic & Optional Life Certificate."  Most importantly for the present case, the Anthem Policy gave insureds the right to convert to an individual life insurance plan without submitting proof of insurability in the event that the group policy was terminated for one of four enumerated reasons, provided they did so by written application to Anthem within 31 days of termination.

Steel King continued the Health & Life Plan for calendar year 2012, but it changed insurers from Anthem to Reliance Standard Life Insurance Company ("Reliance").  As of January 1, 2012, therefore, life insurance was provided under the Reliance Policy, group policy no. GL 149672.  The Reliance Policy provides in part that "eligible classes" for benefits include "[e]ach active, Full-time Employee"; it goes on to define "actively at work" and "active work" as "actually performing on a Full-time basis each and every duty pertaining to your job in the place where and the manner in which the job is normally performed.  This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of injury or illness."  (Brent Jacobson Aff. Ex. 6 (dkt. #19-6) 1.0-2.0.)

Because Robert Lucas was *not* an active Steel King employee on January 1, 2012 due to his chronic illness, he fell outside of the Reliance Policy's definition of "eligible classes,"

although he would have remained eligible for benefits for a while longer under the terms of the Anthem Policy were it still in effect.[3]  Steel King did not inform Robert Lucas of the termination of the Anthem Policy at the time the change in insurers occurred, nor did it advise him as to the possible consequences of, or opportunities presented by, this change on Lucas's coverage.

Robert Lucas passed away on July 7, 2012.  Less than two weeks later, on or about July 19, 2012, plaintiff completed a beneficiary claim form to Anthem.  On or about July 27, 2012, she received a letter in reply from Anthem that read in part:

> After review of the information received we must deny this claim for Group Term Life Insurance Benefits.  [The Anthem Policy] issued to cover certain employees of Steel King Industries, Inc. terminated on December 31, 2011.  Since Mr. Lucas died on July 7, 2012 [the Anthem Policy] was not in force at the time of his death.

> In order for Mr. Lucas to continue coverage after the termination of [the Anthem Policy] he would have needed to convert his coverage to an individual policy.  We have no record that Mr. Lucas ever converted his coverage.

(*See* Teresa Lucas Aff. Ex. 2 (dkt. #31-2) 1.)

OPINION

## I.  Availability of Monetary Relief

Defendant first argues that it is entitled to summary judgment on the grounds that ERISA does not allow for the $25,000 in monetary relief that Teresa Lucas seeks.  The

---

[3] The Anthem Policy provides that life insurance coverage ends on the date employment terminates, meaning the date on which the employee is no longer actively at work.  It goes on to state that "if You are not actively at Work due to Illness or Injury, Your insurance will be continued in force under the Policy until … the end of the 6 month period following the date on which You were last Actively at Work [.]"  (Brent Jacobson Aff. Ex. 4 (kdt. #19-4) ECF 22.)  Because Robert Lucas's last active day of work was in September of 2011, he would have retained coverage through March of 2012.

parties appear to agree that plaintiff's suit arises under section (a)(3) of ERISA's civil enforcement provision, 29 U.S.C. § 1132 (also known as § 502).[4]   Section (a)(3) is a "catchall" provision that "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy."  *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).  It provides that a civil action may be brought:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

Under the terms of Section (a)(3), Lucas is explicitly limited to injunctive or "other appropriate equitable" relief.  Defendant concedes that monetary relief may be equitable in some circumstances, as in the case of restitution, but argues that restitution is appropriate only when a defendant has been unjustly enriched or is withholding a benefit to which plaintiff is entitled.  (*See* Def.'s Reply (dkt. #35) 23.)  Steel King itself is not currently withholding monies paid by Anthem and due to Robert Lucas.  Indeed, payment on the life insurance policy would come directly from the insurer to Lucas, not from Steel King.  Accordingly, Steel King argues that the relief plaintiff seeks is unavailable.

Case law indicates that the equitable relief available under ERISA is neither so limited nor so dependent on technicalities as defendant would now contend.  In *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011), the Supreme Court addressed the equitable remedies available to redress a violation of ERISA's statutory disclosure requirements (the

---

[4] This section permits equitable relief running to an individual, not just plan-wide relief.  *See Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 993 (7th Cir. 1993).

same statutory provisions at issue in this case).[5]  The district court found that the employer had failed to provide a comprehensible, accurate summary plan description and summary of material modifications to the plan ad required by ERISA.  As a remedy, the court reformed the pension plan to provide employees with additional benefits and required CIGNA to pay appropriate benefits to those class members who had already retired.  *See id.* at 1875.

On review, the Supreme Court agreed that those money payments constituted a "surcharge" and, therefore, were appropriate equitable relief for an ERISA violation:

> Equity courts possessed the power to provide relief in the form of monetary "compensation" for a *loss resulting from a trustee's breach of duty*, or to prevent the trustee's unjust enrichment. Indeed, prior to the merger of law and equity this kind of monetary remedy against a trustee, sometimes called a "surcharge," was "exclusively equitable."  The surcharge remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

*Id.* at 1880 (internal citations omitted) (emphasis added).  In sum, contrary to the District Court's fears, the Court concluded that "the types of remedies the court entered here fall within the scope of the term 'appropriate equitable relief' in § 502(a)(3)." *Id.*

Applying the rule articulated in *CIGNA,* this court is persuaded that the monetary relief plaintiff seeks for this alleged breach of duty is theoretically available under ERISA's "catch-all" provision.  Effectively, Teresa Lucas seeks $25,000 as "compensation" for a loss allegedly resulting from Steel King's breach of its fiduciary duties to her husband.  Her request, therefore, fits into the rubric of appropriate equitable relief that the *CIGNA* Court described, whether or not the remedy she seeks technically qualifies as "restitution."

---

[5] The employer in *CIGNA* was also found to have violated ERISA § 204(h), which at the relevant time forbade amendment of a pension plan that would provide for a significant reduction in the rate of future benefit accrual unless the plan administrator also sent a written notice with either the text of the amendment or its likely effects. *CIGNA*, 131 S. Ct. at 1874.

Admittedly, the facts in *CIGNA* are not identical to those in the present case.  In *CIGNA,* the employer switched pension plans and advertised the switch to its employees in a manner the district court found "significantly incomplete" and intentionally misleading, with the switch leaving a significant number of employees worse off in at least a few specific ways.  *See id.* at 1872-75.  In contrast, plaintiff here alleges no intentional misrepresentation but rather a simple failure to disclose.  On the other hand, the Supreme Court in *CIGNA* did not suggest a limit to, much less expressly limit, the availability of monetary relief to instances of intentional misrepresentation, nor does Steel King offer a compelling reason to confine the holding in *CIGNA* so narrowly. Indeed, the *CIGNA* Court focused on the significance of a fiduciary relationship, rather than the particulars of the violation at issue, in determining that appropriate equitable relief under ERISA may take the form of monetary damages.  *See id.* at 1880 ("Thus, insofar as an award of make-whole relief is concerned, the fact that the defendant in this case . . . is analogous to a trustee makes a critical difference.").  Since there is no dispute here that, like the employer in *CIGNA*, Steel King owed a fiduciary duty to Plan participants, including its former employee, Robert Lucas, the factual *differences* between *CIGNA* and this case do not appear to foreclose monetary relief as a possibility.

## II. Statutory Notice Requirements

Steel King next argues that it did not violate the statutory notice requirements of ERISA as established in 29 U.S.C. §§ 1022 and 1024(b)(1).  Section 1022 applies to all employee benefit plans and provides in relevant part that:

> A summary of any material modification in the terms of the plan
> and any change in the information required under subsection

> (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title.

29 U.S.C. § 1022(a). The "information required by subsection (b)" includes, among other things, "the plan's requirements respecting eligibility for participation and benefits" and any "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." *Id.* at § 1022(b). There appears to be no dispute between the parties that the change in employee eligibility between the Anthem Plan and Reliance Plan constitutes a "material modification" and falls into the purview of subsection (b). Thus, ERISA requires that Steel King furnish a summary of that change "in accordance with section 1024(b)(1)." 29 U.S.C. § 1022(a).

Section 1024(b)(1) requires that the administrator of any employee benefit plan subject to ERISA furnish to each participant and beneficiary under the plan "a copy of the summary plan description, and all modifications and changes referred to in section 1022(a)(1) of this title within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits, or (B) if later, within 120 days after the plan becomes subject to this part."[6] "If there is a modification or change described in section 1022(a) of this title," § 1024(b)(1) further provides that "a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant." *Id.* Plaintiff does not argue that Steel King violated the 210-day requirement. (*See* Pl.'s Resp. (dkt. #26) 11-12.)

---

[6] ERISA defines "participant" as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7).

Rather, she focuses on the 90-day requirement, arguing that Robert Lucas first became a participant in the Reliance Policy on January 1, 2012, which would have required Steel King to provide him with a summary plan description and all modifications and changes within 90 days.

Thus, a key issue is whether: (1) the switch in insurance policies created a *new* plan, which would trigger the 90- or 120-day notification deadline of §§ 1024(b)(1)(A) and (B);[7] or (2) the switch merely constituted a "modification or change" to an existing plan, which would have given Steel King 210 days or until July of 2013 to notify participants of that change under § 1024(b)(1). Plaintiff argues that the Reliance Policy constituted a new "employee benefit welfare plan" and that Steel King should have provided Robert Lucas with a summary plan description and all modifications and changes within 90 days of January 1, 2012, when he first became a "participant." In contrast, Steel King contends the retention of the Reliance Policy is not itself a plan, but merely *part* of a plan. Under that interpretation, Robert Lucas would not have "become a participant" when the switch of insurers occurred, since he already was one, so the switch would not trigger any notification obligations for 210 days.[8]

---

[7] Both sides assume that the 90-day requirement under subsection A, rather than the 120-day requirement under subsection B, is applicable here. While the establishment of a new plan would trigger the 120-day requirement as well, since the new plan would first have become "subject to this part" upon its establishment, the court need not resolve this question since Steel King did not inform Robert Lucas of the change within either 90 or 120 days of its occurrence.

[8] Assuming that plaintiff's interpretation were correct, there would still be some question as to whether Robert Lucas actually became a "participant" in the Reliance Policy such that the notice requirements applied to him, given that the policy does not extend life insurance coverage to employees on leave for injury or illness. The parties do not brief this question, however, and Steel King appears to concede that a genuine dispute of fact exists as to when Robert Lucas lost his eligibility to receive a benefit of any type from a Steel King employee welfare benefit plan. (*See* Def.'s Br. Supp. Summ. J. (dkt. #17) 10.)

The regulations implementing ERISA state that an individual becomes a participant covered under an employee welfare benefit plan "on the earlier of—(A) The date designated by the plan as the date on which the individual begins participation in the plan; (B) the date on which the individual becomes eligible under the plan for a benefit subject only to occurrence of the contingency for which the benefit is provided; or (C) the date on which the individual makes a contribution to the plan, whether voluntary or mandatory."  29 C.F.R. § 2510.3-3(d)(1)(i).  Unfortunately, the parties propose no findings of fact or evidence related to these factors, relying instead on ERISA's statutory definition of "employee welfare benefit plan," which reads in relevant part:

> [A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

29 U.S.C. § 1002(1).

As a preliminary matter, this statutory language hints that an employee welfare benefit *plan* is distinct from the insurance policies it carries:  a "plan" may provide for participants or their beneficiaries "through the purchase of insurance or otherwise."  More specifically, this language at least suggests that a plan and its underlying insurance may be obviously related but are not one and the same, and a plan could theoretically endure even if the employer alters the *method* by which it provides benefits through that plan.

Plaintiff cites to three cases in support of her contention that an insurance policy alone may also be an employee welfare benefit plan.  Those cases are of little assistance,

10

however, because while they hold that group insurance may constitute an employee welfare benefit plan, they do not discuss whether an existing *plan* endures when the insurance underwriter changes, which is the real issue here.  As the district court found in *Dreznin v. Reliance Standard Life Insurance Company*, 350 F. Supp. 2d 308, 311-12 (D. Mass. 2004), there is no dispute that the purchase of a group life insurance policy may serve to establish an ERISA plan for statutory and regulatory purposes.  Indeed, the statutory definition of "employee benefit welfare plan" says as much.  But *Dreznin* offers no guidance as to whether a switch in underwriters creates a *new* plan.  Similarly in *Smith v. Jefferson Pilot Life Insurance Company*, 14 F.3d 562, 567 (11th Cir. 1994), while the court concluded that group life and medical insurance coverage constituted an employee welfare benefit plan, it is silent as to the impact of a change in underwriter.[9]

Furthermore, one of the cases plaintiff cites actually cuts against her interpretation, finding as it does that the purchase of insurance alone does not necessarily establish an ERISA plan.  In *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982) (en banc), the Eleventh Circuit addressed the question of when an employee welfare benefit plan has been "established" such that ERISA applies.  It stated that "[s]ome essentials of a plan, fund, or program can be adopted, explicitly or implicitly, from sources outside the plan, fund, or program . . . but no single act in itself necessarily constitutes the establishment of the plan, fund, or program."  *Id.* at 1373.  Most relevant to the present case is this statement from the Eleventh Circuit's *en banc* decision: "For example, the purchase of insurance does not conclusively establish a plan, fund, or program, but the purchase is evidence of the

---

[9] It is worth noting that the *Smith* court used language distinguishing between the "Group Life and Medical Insurance Plan" and its underlying insurance policy.  *See Smith*, 14 F.3d at 565 ("The Plan was insured through an insurance policy, Group Insurance Policy No. 3469[.]").

establishment of a plan, fund, or program; the purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established." *Id.* While *Donovan* is not binding on this court, the Seventh Circuit has cited *Donovan* approvingly, both for its general approach to determining whether a plan has been established and for the proposition that a plan "may adopt some of its essential provisions from sources outside itself, *e.g.*, from the insurance policies that provide the Plan's funding." *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 739 (7th Cir. 1986); *see also Madden v. Country Life Ins. Co.*, 835 F. Supp. 1081, 1084 n.3 (N.D. Ill. 1993) ("While the purchase of insurance may be one indicator of creation of an ERISA plan, it does not conclusively establish that a plan has been created.").

Consistent with this approach, courts tend to assess a variety of factors to determine whether an employer's obligations "rise to the level of an ERISA plan." *Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 455 (1st Cir. 1995). "[E]vidence that an employer committed to provide long-term or periodic benefits to its employees will often be telling." *Id.* (citing *Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees*, 974 F.2d 391, 400 (3d Cir. 1992); *Kenney v. Roland Parson Contracting Corp.*, 28 F.3d 1254, 1258-59 (D.C. Cir. 1994)). Thus, where an employer *treats* a program of periodic benefits as an employee welfare benefit plan by preparing a summary plan description, for example, or by undertaking long-term administrative responsibilities, a court may find that an employee welfare benefit plan subject to ERISA exists. *See Dreznin*, 350 F. Supp. 2d at 312.

Here, all the evidence supports a finding that Steel King treated the Health & Life Plan, not the underlying insurance policies by which the plan was funded, as an employee welfare benefit plan subject to ERISA. For instance, Department of Labor statistics culled

12

from Steel King's annual 5500 report filings reflect that Steel King's Health & Life Plan has been in effect since April 13, 1989, even though Steel King has changed insurers on multiple occasions.  (*See* 2d Brent Jacobson Aff. Ex. 12 (dkt. #38-2).)  Moreover, the Health & Life Plan continued to provide $25,000 of life insurance without interruption to Steel King's employees from December 31, 2011 (the last day of the Anthem Policy) to January 1, 2012 (the first day of the Reliance Policy).  For all intents and purposes, it is the Health & Life Plan that provided Steel King's employees with uninterrupted life insurance benefits; the fact that the underwriter of the Health & Life Plan changed from Anthem to Reliance may have altered Steel King's *method* of providing those benefits, or even the extent of those benefits, but that does not mean that the "plan, fund, or program" providing those benefits *itself* terminated and a new one began.

That *Robert Lucas*, personally, was no longer eligible for benefits under the terms of the new policy also does not transform that policy into a new "employee welfare benefit plan."  If anything, the move from Anthem to Reliance constituted a "modification" to the terms of the existing plan.  To hold otherwise would effectively require the administrator to keep track of every employee's circumstances and provide them with notifications on an individualized basis.

Overall, plaintiff offers no sound legal or factual basis to treat the Reliance Policy itself as a new "employee welfare benefit plan."  Not only do courts tend to treat an employee welfare benefit plan as being separate from the insurance policy underlying it -- a distinction that derives at least some support from the statutory text -- but Steel King has treated the Health & Life Plan as a single, continuous ERISA plan since its inception both in its filings and in the way it structured the plan to provide uninterrupted benefits.

Unfortunately for plaintiff, the lack of legal authority or evidence supporting her characterization of the Reliance Policy as a new employee welfare benefit plan is fatal to plaintiff's claim that Steel King failed to provide the notification required by statute, since her theory depends on the establishment of a new plan to trigger the 90-day notification requirement.  Accordingly, defendant is entitled to summary judgment on plaintiff's claims under §§ 1022 and 1024.

### III. Breach of Fiduciary Duty

Beyond Steel King's alleged violation of its statutory disclosure obligations under ERISA, plaintiff argues that Steel King breached its independent fiduciary duty to the Lucases by failing to provide material information regarding the termination of the Anthem Policy, the conversion process and the terms of the new Reliance Policy.  ERISA statutorily establishes a fiduciary duty known as the "prudent man standard of care," which requires a fiduciary to discharge his duties with respect to a plan "solely in the interest of the participants and beneficiaries" and for the exclusive purpose of benefiting participants and beneficiaries with the care, skill, prudence and diligence a prudent man would use and in accordance with documents and instruments governing the plan.  *See* 29 U.S.C. § 1104(a). "This duty also implicates '[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation.'"  *Herman v. Cent. States, Se. and Sw. Areas Pension Fund,* 423 F.3d 684, 695 (7th Cir. 2005) (quoting *Varity Corp.*, 516 U.S. at 502 (alterations in original)).  In plaintiff's view, Steel King's failure to inform its employees, including Robert Lucas, of the move from the Anthem Policy to the Reliance Policy violated that duty because, while the

Anthem Policy provided for the right to convert to individual coverage, there was no way for employees to *exercise* that conversion right absent notification of the change in providers.[10]

Steel King opposes this argument in essentially two respects. First, Steel King argues that ERISA simply does not require employers to provide individualized notice of conversion rights to their employees. Second, it argues that even if Robert Lucas was entitled to such notice, he did not have the right to convert under the terms of the Anthem Policy.

To support the first argument, Steel King cites a number of cases, including *Walker v. Fed. Express Corp.*, 492 F. App'x 559 (6th Cir. 2012). In *Walker*, the Sixth Circuit held that "ERISA does not contain any provision that requires a plan administrator to provide notice to plan participants other than a summary plan description and information of the benefits plan as discussed under 29 U.S.C. §§ 1021(a)(1) and 1022." Other courts, including the Court of Appeals for the Seventh Circuit, have taken a similar view. *See, e.g.*, *Maxa v. John Alden Life Ins. Co.*, 972 F.2d 980, 985-86 (8th Cir. 1992) (no fiduciary duty to disclose to individual on his birthday that his benefits would be reduced and that he needed to enroll in Medicare); *Cummings by Techmeier v. Briggs & Stratton Retirement Plan*, 797 F.2d 383, 387 (7th Cir. 1986) (fiduciaries are not required to provide individualized attention to

---

[10] In her sur-reply, plaintiff advances another theory of Steel King's breach of fiduciary duty: she argues that the change from the Anthem Policy to the Reliance Policy was itself a breach of fiduciary duty, because Steel King switched policies without reviewing the terms or considering the impact on employees like Robert Lucas, thereby depriving them of the $25,000 in life insurance coverage the collective bargaining agreement mandated that Steel King provide. (*See* Jenifer Binder Aff. Ex. 2 (dkt. #32-4) ECF 30.) The problem with this theory is that Steel King terminated Robert Lucas's benefits as of March 3, 2012, consistent with the Anthem Policy's terms because he had not worked in more than six months. (*See* Brent Jacobson Aff. Ex. 4 (dkt. #19-4) ECF 22; 2d Brent Jacobson Aff. Ex. (dkt. #37-1) ECF 27.) Even if Steel King had *not* switched insurers, then Robert Lucas would not have had life insurance coverage when he passed away on July 7, 2012. Thus, even if the switch itself constituted a breach of fiduciary duty, it would seem that no reasonable fact-finder could conclude that Steel King's breach *caused* the harm of which plaintiff complains.

participants); *Howard v. Gleason Corp.*, 716 F. Supp. 740, 744 (W.D.N.Y. 1989) ("I agree with plaintiff that it would have been a good idea for an employer to include a printed notice of an employee's conversion option with his or her final paycheck.  Unfortunately, that responsibility is not mandated by the ERISA.  That may be a matter for Congress to consider.").

Plaintiff acknowledges that there is no obligation under ERISA to provide plan participants with post-termination notice of life insurance conversion rights.  (*See* Pl.'s Resp. (dkt. #26) 21.)  Instead, plaintiff would distinguish the present case by arguing that Steel King failed to inform its employees *generally* of the Anthem Policy's termination, not just failed to notify Robert Lucas of his individual conversion rights.  Steel King dismisses this argument as a "distinction without a difference," but case law suggests otherwise.  Indeed, the cases Steel King cite generally stand for the proposition that an employee has no right to *individualized* notice under ERISA -- that is, to notice of their individual rights and options based on their particular circumstances.[11]  This makes sense.  As the Seventh Circuit noted in *Cummings*, "[t]he opposite interpretation would impose an almost impossible burden on ERISA plan administrators to seek out and maintain sufficient current information about the health and individual needs of each plan member to enable the

---

[11] In all but one of the cases Steel King cites, the employees challenged a lack of notice for some option arising from an event unique to that employee.  *See Walker*, 492 F. App'x at 561 (employee's termination triggered right to convert to individual coverage); *Maxa*, 972 F.2d at 985 (employee's sixty-fifth birthday triggered reduction in benefits); *Cummings*, 797 F.2d at 386-87 (employee failed to elect survivorship option due to mental confusion); *Prouty v. Hartford Life & Acc. Ins. Co.*, -- F. Supp. 2d --, 2014 WL 554556, at *1 (D. Mass. Feb. 12, 2014) (employee's termination triggered right to convert life insurance); *Weeks v. W. Auto Supply Co.*, No. Civ.A. 7:02CV00724, 2003 WL 21510822, at *2 (W.D. Va. June 25, 2003) (employee's resignation triggered right to convert life insurance).  The outlier is *Howard*, in which the employee's right to convert to an individual insurance policy arose from a sale of the entire division in which he worked.  *See Howard*, 716 F. Supp. at 742.  But even *Howard* is distinct from this case in that the employee was aware of the event triggering his right to convert, even though he was confused as to its implications.

administrators to render personal service." *Cummings*, 797 F.2d at 387.  Instead of placing such an onerous responsibility on the plan's administrators, courts permit them to rely on the disclosures in the statutorily-mandated plan documents, so long as those disclosures are complete and correct.   *See, e.g.*, *id.* at 387-90 (no breach of fiduciary duty where administrators made required disclosures and there was no evidence that they affirmatively misled employee); *cf. Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 548 (7th Cir. 1997) (No breach of fiduciary duty where nonfiduciary agent made misleading statement about plan; "We hasten to add, however, that our resolution of this case depends in large measure on the fact that the Trustees provided complete and accurate information in the Plan and Plan Booklet they distributed to all participants.").

Barring plaintiff's claim that Steel King failed a larger group of its Plan participants and beneficiaries makes little sense here for at least two reasons.  *First*, the Plan documents Steel King provided its employees did *not* adequately disclose the general terms and conditions of the life conversion rights.  To be clear, the court takes no position on whether the summary plan description Robert Lucas personally received was statutorily adequate; plaintiff does not make that argument.  Even presuming the Plan documents were perfectly clear in explaining when Robert Lucas would have the right to convert his coverage, he and others like him could not have exercised that right based on those documents alone.  Unlike the cases on which Steel King would rely, a critical disclosure for employees was missing: the fact that the Anthem Policy had terminated.[12]  Without that knowledge, Robert Lucas could

---

[12] The Anthem Policy lists four events giving rise to a right to convert; the parties agree that the one at issue in this case is the third, the termination of the Anthem Policy itself.  *See* discussion, *infra*.

not possibly have known that he may have had the right to convert his life insurance to an individual policy as of January 1, 2012, the clarity of the Plan documents notwithstanding.

*Second*, the right to convert in this case did not arise from Robert Lucas's individual circumstances. Any conversion rights he had arose from the Anthem Policy's termination -- an event that presumably would have triggered conversion rights for *all* employees insured under that Policy -- not from his illness. *Cf. Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000) ("In this case, the information the Plan should have provided . . . would not have been information unique to her situation; rather, the information she needed would have been information relevant to all Plan participants who were rehired by Wal-Mart within a few weeks or months after leaving the company."). Under these circumstances, there is little to no danger of overburdening the fiduciary. Steel King need not have "[sought] out and maintain[ed] sufficient current information about the health and individual needs of each plan member to enable the administrators to render personal service." *Cummings*, 797 F.2d at 387. It need only have notified its employees that the Anthem Policy was slated for replacement. These distinctions persuade the court that cases like *Cummings* and *Walker* are inapplicable here.

Of course, this determination does not necessarily mean that Steel King breached its fiduciary duties by failing to notify participants of *any* occurrence that may affect their rights. Seventh Circuit case law indicates that fiduciaries *do* have an extra-statutory duty to disclose material information under certain circumstances, for example, when a fiduciary misleads plan participants or misrepresents the terms or administration of a plan. *Bowerman*, 226 F.3d at 590 (quoting *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993)). "Although not every error in communicating information regarding a plan

18

will be found to violate a fiduciary's duty under ERISA, [the Seventh Circuit] ha[s] made clear that fiduciaries must communicate material facts affecting the interests of plan participants or beneficiaries and that this duty to communicate exists when a participant or beneficiary 'asks fiduciaries for information, and even when he or she does not.'" *Id.* (internal citations omitted) (quoting *Anweiler*, 3 F.3d at 991); *see also In re Unisys Corp. Retiree Medical Ben. ERISA Litig.*, 57 F.3d 1255, 1262 (3d Cir. 1995) ("[A] plan administrator has an affirmative duty to 'speak when it knows that silence might be harmful.'"); *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990) ("A fiduciary has a duty not only to inform a beneficiary of new and relevant information as it arises, but also to advise him of circumstances that threaten interests relevant to the relationship.").[13]

Less clear is whether the present facts give rise to a duty to disclose and, if so, what. Most of the cases touching on this duty deal with instances in which plan documents are silent or ambiguous on a recurring topic and statements by fiduciaries agents serve to exacerbate the confusion. *See Kenseth,* 610 F.3d at 472. The court has found no case in which the challenged action was the fiduciary's silence on *factual circumstances* affecting participants' rights under the plan, rather than silence with respect to the terms of the plan itself. Even so, the fact of a change in insurance provider, particularly where the terms of

---

[13] Administrators may also be equitably estopped from denying coverage "when countervailing ERISA principles would not be impeded and 'one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation.'" *Bowerman*, 226 F.3d at 586. Estoppel does not appear applicable in this case, because plaintiff does not suggest Steel King made a statement that Robert Lucas would remain covered until his death, even though he was not actively at work. To the contrary, the original Anthem Policy states that an employee's life insurance "will be continued in force under the Policy until the earlier of [] the date on which We receive Written notice from the Plan Sponsor that Your insurance is to be terminated; *or* [] the end of the 6 month period following the date on which You were last Actively at Work[.]" (Brent Jacobson Aff. Ex. 4 (dkt. #19-4) ECF 22.)

the coverage and eligibility have changed, would seem significant enough to justify requiring an affirmative disclosure.

The court need not attempt to resolve whether plaintiff has a viable breach of fiduciary duty claim, however, because defendant's second argument -- that Robert Lucas actually lacked the right to convert his coverage -- precludes plaintiff from recovering regardless of the answer.  The Anthem Policy includes a section on the right to convert that reads in pertinent part:

> **Who May Convert**
>
> You will have the right to have Us issue to You an individual life insurance policy without submitting Proof of Insurability if all or part of Your insurance under the Group Policy terminates for any of the following reasons:
>
> 1. Your employment terminates while the Group Policy is in force.
>
> 2. Your membership in a Class terminates while the Group Policy is in force.
>
> 3. The Group Policy terminates.  You must have been insured under the Group Policy for at least 5 years.
>
> 4. The Group Policy is amended to cancel the insurance on the Class of persons under which You were insured.  You must have been insured under the Group Policy for at least 5 years.

(Brent Jacobson Aff. Ex. 4 (dkt. #19-4) ECF 35.)

The parties agree that Robert Lucas's right to convert, if any, would have arisen under option 3, which requires that he have been insured under the "Group Policy" for at least five years.  (Pl.'s Resp. (dkt. #26) 25; Def.'s Reply (dkt. #35) 23.)  "Group Policy" is defined as "the policy issued by Us to the Plan Sponsor and described in this Certificate."

(Brent Jacobson Aff. Ex. 4 (dkt. #19-4) ECF 15.)  "Us" means "the insurer, Anthem Life Insurance Company."  (*Id.* at ECF 16.)

The Anthem Policy states that its "Policy Effective Date" was September 1, 2007. (*See* Brent Jacobson Aff. Ex. (dkt. #19-3) ECF 3.)  Steel King has also submitted a copy of an insurance policy issued to Steel King by United Wisconsin Group; that policy was apparently effective as of January 1, 2005.  (*See id.* (dkt. #19-8) ECF 2.)  Finally, Steel King submits a letter from Anthem to Steel King, which states that, "[a]s of September 1, 2007, . . . the life and disability products offered in Wisconsin, formerly by United Wisconsin Group, will be offered and underwritten by Anthem Life Insurance Company." (Sandra Michur Aff. Ex. (dkt. #20-2) ECF 1.)   Steel King argues that this evidence establishes that the Anthem Policy did not take effect until September 1, 2007, meaning that when it terminated on December 31, 2011, Robert Lucas could not have been insured under it for the required five years.

Plaintiff responds that a genuine dispute of fact exists on this point.  As evidence, she submits an e-mail purportedly received by her attorney on April 10, 2013 from "Kathryn Roberts," an Anthem employee.  The e-mail reads, in its entirety:

> Hi Jenifer,
>
> I show that his effective date was 6/1/2003, when the group started coverage with Anthem Life.
>
> Hope that this helps.
>
> Kathy

Plaintiff argues that this e-mail serves to create a genuine dispute of fact as to the effective date of the Anthem Policy.  Indeed, were this e-mail binding, Robert Lucas would have been insured for more than five years and would have had the right to convert under option 3.

21

Again unfortunately for plaintiff, this e-mail is not even evidence but is instead inadmissible hearsay, offered for the truth of the matter asserted -- the start date of the Anthem Life policy.  *See* Fed. R. Evid. 801(c).  While a party need not offer evidence in an admissible form to survive summary judgment, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), "[a] party may not rely on inadmissible hearsay to avoid summary judgment," *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011).  Instead of offering Roberts' sworn testimony or some other evidentiary basis for inferring that the 2003 date (or even a 2005 date) applies, plaintiff seeks to rely entirely on an unsworn statement in the form of an e-mail from an employee of a non-party.  Because of its fundamental inadmissibility, this evidence cannot serve to establish a genuine dispute of fact as to the date the Anthem Policy became effective.[14]  *See id.* at 656-57 (affirming district court's decision to exclude "an unsworn statement, in the form of [a] letter, from the declarant" on summary judgment).

The only other evidence plaintiff presents on this point is: (1) the letter denying her claim, in which Anthem indicated that Robert Lucas "would have needed to convert his coverage" to continue receiving benefits and there was no record of such conversion; (2) a letter in which Steel King's director of human resources indicated the Anthem Policy's "anniversary date" would be June 1, 2008; and (3) a Hold Harmless Agreement, in which Anthem agreed "to pay group term life insurance benefits under the Anthem Life group policy in accordance with the beneficiary designations provided in the enrollment forms of

---

[14] Plaintiff also asks the court to give her additional time to take discovery on this point pursuant to Fed. R. Civ. P. 56(d), but offers no basis for finding that this information was previously unavailable, nor has she described her previous diligence in seeking this discovery.  *See Citizens for Appropriate Rural Roads, Inc. v. Foxx*, -- F. Supp. 2d --, 2014 WL 1323189, at *18 (S.D. Ind. Mar. 31, 2014).

the Group's prior carrier for group term life insurance." (*See* Sandra Michur Aff. Ex. 2 (dkt. #20-2) Steel King 00330.)

Without the e-mail from Roberts, the court does not believe this is enough to do more than create a "metaphysical doubt" as to the effective date of the Anthem Policy. Steel King has presented unrefuted evidence that the Anthem Policy's actual start date was September 1, 2007, and that a different insurer, United Wisconsin Group, provided coverage until that point. The plain terms of the Anthem Policy make clear that Robert Lucas had to be insured under *that particular policy*, issued *by Anthem*, for five years before acquiring the right to convert his coverage under option 3.

Plaintiff's evidence establishes only that: (1) Robert Lucas would have had to convert for continued coverage and did not; (2) the anniversary date of the Anthem Policy going forward was June 1, 2008; and (3) Anthem agreed to pay benefits in accordance with previous beneficiary designations. None of those facts creates a genuine dispute as to whether Robert Lucas was insured for five years under the Anthem Policy. Finally, plaintiff presented no evidence that Anthem picked up where United Wisconsin Group left off for purposes of calculating how long participants had been covered.

While the court is sympathetic to plaintiff, she is not entitled to compensation that would have been unavailable to her even if Steel King had promptly informed her husband of the change in insurers. A beneficiary is entitled to relief for a breach of fiduciary duty only if "the breach resulted in harm to the plaintiff." *Killian*, 742 F.3d at 658 (quoting *Kenseth*, 610 F.3d at 464). Accordingly, defendant is entitled to judgment as a matter of law on this claim as well.

ORDER

IT IS ORDERED that defendant Steel King Industries' motion for summary
judgment (dkt. #16) is GRANTED.  The clerk of court is directed to enter judgment and
close this case.

Entered this 16th day of July, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

24